[Cite as *State v. Curry*, 2016-Ohio-861.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

     PLAINTIFF-APPELLEE,          CASE NO. 1-15-05

     v.

ROBERT O. CURRY,          O P I N I O N

     DEFENDANT-APPELLANT.

Appeal from Allen County Common Pleas Court
Trial Court No. CR20140047

**Judgment Affirmed**

Date of Decision: March 7, 2016

APPEARANCES:

     *F. Stephen Chamberlain* **for Appellant**

     *Jana E. Emerick* **for Appellee**

**SHAW, P.J.**

{¶1} Defendant-appellant Robert O. Curry ("Curry") appeals the December 22, 2014 judgment of the Allen County Common Pleas Court sentencing Curry to an aggregate prison term of 13 years after Curry was convicted in a bench trial of Rape in violation of R.C. 2907.02(A)(2), a felony of the first degree, and Robbery in violation of R.C. 2911.02(A)(2), a felony of the second degree.

*Relevant Facts and Procedural History*

{¶2} Curry was indicted on March 13, 2014, for one count of Rape in violation of R.C. 2907.02(A)(2), a felony of the first degree, and one count of Robbery in violation of R.C. 2911.02(A)(2), a felony of the second degree. The indictment alleged that both crimes occurred on October 25, 2012. (Doc. No. 3). In addition, both crimes were alleged to have been perpetrated against the same victim. Curry pled not guilty to the charges.

{¶3} On May 1, 2014, Curry and the State of Ohio entered into an "Entry of Stipulation of Use of Polygraph Test" wherein Curry agreed to take a polygraph test. (Doc. No. 19). The agreement indicated that Curry would take a polygraph examination performed by "a qualified examiner employed by the Ohio Bureau of Criminal Investigation." (*Id.*) As to the contents of the agreement, the agreement stated that if it was determined that Curry was not being deceptive throughout the examination, the State would dismiss the Rape charge against Curry with

prejudice; however, the agreement stated that if Curry was being deceptive in the examination the results could be offered and received as evidence at trial without objection by either party. (*Id.*) The agreement contained an exception that stated if the results were inconclusive the examination would not be the subject of any testimony whatsoever. (*Id.*) The agreement was signed by Curry, his attorney, and the prosecuting attorney. (*Id.*)

{¶4} On October 16, 2014, Curry waived his right to a jury trial and elected to have a bench trial.

{¶5} On October 27-28, 2014, the case proceeded to a bench trial. At trial the State called six witnesses which included the victim's manager at Wal-Mart who found the victim crying in an aisle on the date of the alleged incident, the victim, the victim's daughter, the Sexual Assault Nurse Examiner ("SANE"), the polygraph examiner, and the detective who investigated the case. The State also introduced a number of exhibits into evidence including the Rape Kit, the lab results from BCI, and photographs of bruises to the victim's shoulder and her left inner thigh taken on the night of the alleged incident. After the State presented the testimony of its witnesses and entered its exhibits into evidence the State rested its case. At that time Curry made a Crim.R. 29 motion for acquittal, which was overruled, and then he proceeded to his case-in-chief. Curry testified on his own

behalf, and then he rested his case. The State presented one rebuttal witness, recalling the detective who investigated the case, and then rested.

{¶6} Following closing arguments, the trial court recessed to consider the matter. When court reconvened, the trial court announced its decision. The trial court briefly discussed the evidence presented, finding the victim's testimony credible and specifically finding Curry's testimony not credible. The trial court then found Curry guilty of both the Rape and Robbery charges.

{¶7} On November 3, 2014, the trial court filed a judgment entry memorializing its finding of guilt on both the Rape and the Robbery charges. (Doc. No. 104).

{¶8} On December 17, 2014, the matter proceeded to sentencing. At the sentencing hearing the State requested that Curry be sentenced to a maximum 11 year prison sentence on the Rape charge, and a 6 year sentence on the Robbery charge. The State based its argument on the fact that Curry had multiple prior sex-related offenses and a long criminal history.

{¶9} Curry's attorney argued for an aggregate prison sentence under 10 years. Curry then made a lengthy statement to the court disavowing the polygraph test, refuting the victim's testimony and her prior statements, and proclaiming his innocence. A victim's advocate read a statement prepared by the victim but the victim was not present at sentencing as she had recently undergone heart surgery.

{¶10} After hearing the arguments of the parties and stating that it had considered the appropriate statutory sentencing factors, the trial court ultimately sentenced Curry to 10 years in prison on the Rape charge, and 3 years in prison on the Robbery charge. Those prison terms were ordered to be served consecutively for an aggregate prison term of 13 years. A judgment entry memorializing Curry's sentence was filed December 22, 2014. (Doc. No. 110).

{¶11} It is from this judgment that Curry appeals, asserting the following assignments of error for our review.

**ASSIGNMENT OF ERROR 1**
**THE DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHERE COUNSEL CONSENTED AND ADVISED DEFENDANT TO STIPULATE TO A POLYGRAPH EXAMINATION WHICH MADE IT POSSIBLE FOR THE STATE OF OHIO TO INTRODUCE OTHERWISE INADMISSIBLE EVIDENCE IN ITS CASE AGAINST THE DEFENDANT THEREBY VIOLATING THE DEFENDANT[']S STATUTORY AND CONSTITUTIONAL RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTION 10 OF THE OHIO CONSTITUTION.**

**ASSIGNMENT OF ERROR 2**
**THE TRIAL COURT COMMITTED ERROR PREJUDICIAL TO THE DEFENDANT-APPELLANT IN ALLOWING THE STATE OF OHIO TO ELICIT TESTIMONY FROM THE ALLEGED VICTIM THAT SHE HAD BEEN OFFERED AN OPPORTUNITY TO HAVE THE CASE DISMISSED. SUCH TESTIMONY BEING IMPROPER WITNESS BOLSTERING AND INTRODUCING EVIDENCE WHICH THE DEFENSE COULD NOT CROSS EXAMINE AND AMOUNTING TO PROSECUTORIAL MISCONDUCT[.]**

**ASSIGNMENT OF ERROR 3**
**THE CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THE CONVICTIONS ARE BASED ON INSUFFICIENT EVIDENCE[.]**

{¶12} We elect to address the assignments of error out of the order in which they were raised.

*Third Assignment of Error*

{¶13} In his third assignment of error, Curry argues that there was insufficient evidence presented to convict him and that his convictions were against the manifest weight of the evidence. Specifically, Curry argues that the victim told inconsistent stories and that her story was less credible than Curry's version of events. Curry argues that "[i]f the credibility is equal, th[e]n there is no way for the [trial court] to find guilt beyond a reasonable doubt." (Appt.'s Br. at 18).

*Sufficiency of the Evidence*

{¶14} Whether there is legally sufficient evidence to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Sufficiency is a test of adequacy. *Id.* When an appellate court reviews a record upon a sufficiency challenge, " 'the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable

doubt.' " *State v. Leonard,* 104 Ohio St.3d 54, 2004–Ohio–6235, ¶ 77, quoting *State v. Jenks,* 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶15} In this case Curry was charged with Rape in violation of R.C. 2907.02(A)(2), which reads, "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."

{¶16} Curry was also charged with Robbery in violation of R.C. 2911.02(A)(2), which reads, "No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall * * * [i]nflict, attempt to inflict, or threaten to inflict physical harm on another[.]"

{¶17} In order to convict Curry of Rape and Robbery at trial the State called six witnesses beginning with Leslie Treglia. Treglia testified that on October 25, 2012, she was a pharmacist for the Wal-Mart pharmacy on Harding Highway in Lima, Ohio. Treglia testified that at that time Pam H., the alleged victim, worked for Treglia as a pharmacy technician. Treglia testified that on October 25, 2012, she noticed Pam making more errors than normal at work, and that Pam "seemed a little off[.]" (Tr. at 17). Treglia testified that later in the evening she noticed Pam in one of the aisles crying. Treglia testified that she asked Pam what was wrong and that Pam eventually told her that she "was

physically attacked and raped by a man." (Tr. at 18). Treglia testified that she suggested that Pam call the police. Treglia also testified that she took Pam to an on-site counseling service at Wal-Mart to get help.

{¶18} The State next called the alleged victim, Pam H. Pam testified that she was 63 years old at the time of trial, that she had two children and that she lived in Lima. Pam testified that she met Curry on "Plenty of Fish," an online social/dating website. (Tr. at 24-25). Pam testified that she "got a message from [Curry] and he inquired have I ever dated a black person and I said no. And then we just started talking. Then we became friends." (*Id*. at 63). Pam testified that she corresponded with Curry through the website, through text and through the phone. (*Id*.) Pam testified that Curry eventually came to see her for the first time at Wal-Mart where she worked. She testified that during that initial meeting Curry stayed at Wal-Mart approximately 10 minutes and then left.

{¶19} Pam testified that she then met Curry at her home multiple times. Pam testified that the first time Curry came to her house the two left to go to Waffle House for breakfast. Pam testified that during the next time Curry came to her house Curry performed oral sex on her and that they attempted to engage in vaginal sex but they could not because Curry was "too big" and "[i]t hurt." (Tr. at 35).

{¶20} Pam testified that prior to the next time Curry came to her house on October 25, 2012, Curry had called her and told her that his wallet was stolen and that he needed money to pay his boss. Pam testified that Curry asked her multiple times for money and she said no. In addition, Pam testified that Curry asked her "probably * * * twenty times that week" to "make love," but she testified that she did not want to. (Tr. at 35).

{¶21} Pam testified that on the morning of October 25, 2012, Curry came to her house and arrived just after she had gotten out of the shower. Curry was invited and Pam was aware he was coming. Pam testified that she was still in her bathrobe when he arrived. Pam testified that she and Curry got into an argument shortly after he arrived as Curry was angry that Pam had told her daughters that Curry had asked Pam for money. Despite Curry being upset, Pam testified that Curry talked about "making love," but Pam told him that she did not want to. (Tr. at 35). Pam testified that around that time Curry got a text message from "Pam from Fostoria or something like that." (Tr. at 35). Pam testified that she became angry that Curry was keeping women in multiple cities and putting them in his phone by the city that they lived in. (*Id.* at 35-36). Pam testified that Curry told her the other woman's "last name [was] really Fostoria." (Tr. at 36). Pam testified that she asked Curry how many women he had and she testified that a whole "new side" of Curry came out. (*Id.* at 36).

{¶22} Pam testified that Curry then said "come on" and grabbed her and pushed her down on the bed in her bedroom. (Tr. at 37). Pam demonstrated how Curry grabbed her to the trial court. Pam testified that Curry said, "Once you have a black man, you'll never go back." (*Id.*) Pam testified that when she was on the bed Curry then grabbed her shoulder and her left leg. Pam testified that Curry said he was going to show her "what a real man feels like." (*Id*. at 39).

{¶23} Pam testified that Curry, "Grabbed [her] leg and moved it over and then he just came down on top of [her] and forced himself inside of [her] and then just started pounding and pounding and pounding." (Tr. at 39-40). Pam testified that she "tried to push him away and [she] tried to move but [she] couldn't. He's too heavy." (Tr. at 41). Pam testified that she was unable to get Curry off of her, that "he was completely on top of [her] when he forced himself inside." (Tr. at 42).

{¶24} Pam testified that she cried during the encounter. She testified that when Curry was finished he got off of her and walked over by his clothes. Pam testified that she went into the bathroom and vomited. At that time Pam testified that Curry told her she did not "have to be so dramatic about this." (Tr. at 44).

{¶25} Pam testified that Curry then went on a "little rant" about his childhood and "how bad his life was and everything." (Tr. at 44). Pam testified that Curry got dressed and went outside and came back to the door several times,

saying that he wanted $50 for fixing her computer. Pam testified that she did not "know what that was all about." (*Id.*) Pam testified that Curry threatened to damage her car if she did not give him money, and that he then threatened to hurt her if she did not give him the money. (Tr. at 45). Pam testified that she got the money and gave it to Curry because she did not want Curry to hurt anyone. (*Id.*) Pam testified that Curry then left her residence.

{¶26} Pam testified that after Curry left she called her daughter and was upset. She testified that she told her daughter about the money but she did not tell her about the sexual assault. Pam testified that she did not initially call the police because she did not think the police would believe her.

{¶27} Pam testified that she went to work and worked until she fell down and cried there in an aisle. Pam testified that Leslie Treglia asked her what was wrong and she told her. Pam testified that she then went to the police station. Pam testified that she initially acted as though she did not know Curry was coming over that morning when she spoke to the police because she was embarrassed and felt like it was her fault. However, Pam ultimately showed the officer her text messages that indicated she invited Curry to come over the morning of the incident.

{¶28} Pam testified that she was taken to the hospital and that she had a rape kit examination done. Pam testified that she spoke with Detective

Stechschulte the morning after the incident and told him her story. Pam further testified that she did not want to be in court testifying about this case but she thought it was important.

{¶29} On cross-examination Pam testified again that Curry had previously performed oral sex on her on a different occasion. She also testified that at one time she thought that eventually there would be a sexual relationship between the two of them. Pam further clarified again that she had previously attempted to have sex with Curry but could not because he was "too big." (Tr. at 75).

{¶30} During cross-examination, defense counsel emphasized the fact that Pam had initially told the first officer she spoke with, Amy Glanemann, that she did not know Curry was coming over the morning of the alleged rape even though she did. Defense counsel also questioned Pam about her statement to Officer Glanemann that Curry pulled her pants off of her before the sexual assault whereas at trial, and during later interviews, Pam maintained that she was wearing a robe at the time of the alleged sexual assault.

{¶31} On re-direct Pam testified that she was very upset when she spoke with the police initially and that she was embarrassed and did not want people to know what happened. As to whether she was wearing a robe or pants during the encounter, Pam testified that she may have been confused when she initially told Officer Glanemann that she was wearing pants because she had been wearing

pants during the prior consensual sexual encounter with Curry. Pam testified that she was certain at trial that she was only wearing a robe on the date of the incident, that she was certain Curry forced her onto the bed, lifted her leg to the side, and that he forced his penis into her vagina. (Tr. at 111). Pam also testified that she was certain Curry threatened to harm her if she did not give him money. (*Id.*)

{¶32} The State next called Amy H., Pam's daughter. Amy testified that at the time of the alleged incident Pam was living with her and Amy's children in Lima. Amy testified that on the morning of October 25, 2012, Pam called Amy crying, stating that Pam had to give Curry $50 because he would not leave. Amy testified that Pam called her later in the evening and stated that she was raped by Curry as well.

{¶33} Amy testified that while she was with her mother later on the date of the incident Curry was calling Pam's phone and Amy spoke with Curry. Amy testified that she asked Curry why he had raped Amy's mother and Curry stated, "she gave [it to me]." (Tr. at 127).

{¶34} The State next called Ronda Norris, a SANE at St. Rita's Medical Center in Lima. Norris testified that she treated Pam on October 25, 2012. Norris testified that she conducted a Rape Kit examination on Pam, which included swabs of Pam's vaginal and anal cavities. Norris also testified that Pam gave her a narrative of what happened to her.

{¶35} Norris testified that Pam had injuries to her right shoulder and her left inner thigh. Photographs of the injuries were introduced into evidence, illustrating small bruises. Norris also testified that Pam had a deep red almost purple-red urethra, indicative of friction. (Tr. at 151-159).

{¶36} The State next called Detective Steven Stechschulte, Jr., of the Lima Police Department. Detective Stechschulte testified that he was assigned to investigate the claims against Curry. Detective Stechschulte testified that he spoke with Pam on the morning after the incident and that at that time Pam was "distraught" and "emotional." (Tr. at 172). Detective Stechschulte testified that Pam told him her story and that she was more forthcoming with him than she had been with the prior officer who had spoken with Pam on the night of the incident, Officer Glanemann. Detective Stechschulte testified that Pam cleared up prior lies she had told to Officer Glanemann. (*Id*. at 174). Detective Stechschulte testified that he stressed the importance of being truthful regardless of whether Pam was embarrassed or whether she felt like she had done something wrong. (*Id*.) Detective Stechschulte testified that it is not uncommon for rape victims to not tell the whole truth initially because they are "embarrassed" or sometimes they "blame themselves." (*Id*. at 175).

**{¶37}** Detective Stechschulte testified that after he heard Pam's story he attempted to locate Curry to get Curry's side of the story but Curry was a "nomad" and was difficult to find. (Tr. at 180).

**{¶38}** Detective Stechschulte testified that he sent the Rape Kit that had been taken of Pam to BCI and had it tested. Detective Stechschulte testified that semen was found in Pam's vagina, and seminal fluid was found in Pam's anal cavity. (Tr. at 182-183). Detective Stechschulte testified that the DNA profile from the semen was run through "CODIS," a database that retains some DNA profiles, and the database returned a match for the DNA to Curry.[1]

**{¶39}** Detective Stechschulte testified that after he got the DNA match results, he received a call from another officer informing him that Curry was at Wal-Mart where Pam worked and that Pam had called the police because she was scared. Detective Stechschulte testified that after receiving that call he sought a warrant for Curry's arrest, but Curry was not located and arrested until four months later.

**{¶40}** Detective Stechschulte testified that he eventually interviewed Curry after Curry was detained. Detective Stechschulte testified that Curry indicated his sexual encounter with Pam was consensual and that he wanted to take a polygraph

---

[1] Curry stipulated to the admission of all exhibits related to BCI testing. Curry's appellate counsel notes at the end of his brief that Curry had wanted an assignment of error related to the admission of the BCI tests but his appellate counsel did not make these arguments because trial counsel had stipulated to their admission and because the semen was consistent with the defense's trial theory of consensual sex.

examination. Detective Stechschulte testified that the polygraph examination was Curry's idea, and that Detective Stechschulte fully explained what that entailed. Detective Stechschulte testified that Curry had no trepidation about taking a polygraph examination.

{¶41} The State next called Cindy Erwin, the polygraph examiner who conducted Curry's examination. Erwin testified as to her qualifications, her training, and her continuing education. She indicated that she had performed over 5,000 polygraph examinations in her career, and she was ultimately classified as an expert in "polygraph administration and interpretation." (Tr. at 229).

{¶42} Erwin testified that the polygraph examination was voluntary and that even on the day of the examination Curry was given the opportunity to change his mind about whether he wanted to take the examination. Erwin further testified that Curry helped decide what the relevant questions would be for the polygraph exam and that he agreed to the questions. (Tr. at 239). Erwin testified that Curry was fully aware of the questions and the procedure before the examination took place. Erwin testified that Curry was confident on the day of the exam and that he had no health concerns that she thought might alter the tests results.

{¶43} Erwin testified, and a State's Exhibit indicated, that Curry was asked a total of 11 questions 3 times. Four of the questions were considered relevant questions. The remaining questions were considered control questions. The four

relevant questions were: (1) Without her permission, did you ever have sexual intercourse with Pam?; (2) Did you ever rape Pam?; (3) Against her will, did you ever put your bare penis into Pam's bare vagina? (4) Without her permission, did you ever insert your bare penis into Pam's bare vagina? (Tr. at 246-247); (State's Ex. 12).

{¶44} Erwin testified that she ultimately determined that Curry was being deceptive with regard to his answers to the relevant questions, and her report stating that conclusion was introduced into evidence. (State's Ex. 11). In addition, Erwin testified that Curry's results were independently examined by a second polygraph examiner and he too agreed that Curry was being deceptive. (Tr. at 244).

{¶45} On cross-examination Erwin further stated that to get the result indicating that he was being deceptive Curry "had to consistently show deception to the relevant questions every time." (Tr. at 251). However, Erwin testified that Curry showed a response to the control questions, just not as much as the relevant questions. On re-direct examination Erwin clarified that there is *always* a "response" to the questions, and that a response is not necessarily indicative of deception. At the conclusion of Erwin's testimony, the State rested its case.

{¶46} Curry now argues on appeal that the State presented insufficient evidence to convict him at trial. Specifically, Curry contends that Pam told

contradictory stories about what occurred between her and Curry on the date of the incident. Curry argues that "there [is] only the testimony of two people one no less credible than the other. One had prior convictions, the other showed a pattern of half-truths and lies to the initial law enforcement investigation. If the credibility is equal, th[e]n there is no way for the Court below to find guilt beyond a reasonable doubt." (Appt.'s Br. at 18).

{¶47} Although Curry argues that there was insufficient evidence to convict him his argument seems to actually be focused on the weight of the evidence. Curry's sole argument regarding sufficiency is based on the credibility of the witnesses. Curry makes no argument on appeal that Pam's testimony, if believed, would be insufficient to establish the Rape and Robbery allegations. Rather, he argues that her testimony should not be believed, or that at the very least it was not substantial enough to meet the State's burden of proof. These are claims that go to weight, rather than sufficiency.

{¶48} Pam's testimony alone was enough to provide sufficient evidence to convict Curry. Pam clearly testified to Curry taking her into her bedroom on October 25, 2012, pushing her down on the bed and forcing his penis into her vagina against her will. Pam testified that she tried to push Curry off of her but he was too big. In addition to Pam's testimony, photographs of small bruises to Pam's shoulder and her inner thigh were introduced into evidence. Curry's semen

was also identified in Pam's vagina. Based on the evidence we cannot find that there was insufficient evidence presented to convict Curry of Rape in this case.

**{¶49}** Similarly, we cannot find that the State presented insufficient evidence to convict Curry of Robbery. Pam testified that after the sexual assault occurred, Curry threatened to hurt her unless Pam gave him $50. Pam testified that she was frightened and she gave Curry the money. Based on the evidence we cannot find that there was insufficient evidence presented to convict Curry of Robbery in this case. Therefore Curry's arguments related to sufficiency of the evidence are not well-taken.

*Manifest Weight of the Evidence*

**{¶50}** Curry next argues that even if there was sufficient evidence presented to convict him, his convictions were against the manifest weight of the evidence.

**{¶51}** The Ohio Supreme Court has "carefully distinguished the terms 'sufficiency' and 'weight' in criminal cases, declaring that 'manifest weight' and 'legal sufficiency' are 'both quantitatively and qualitatively different.' " *Eastley v. Volkman,* 132 Ohio St.3d 328, 2012–Ohio–2179, ¶ 10, quoting *State v. Thompkins,* 78 Ohio St.3d 380 (1997), paragraph two of the syllabus.

**{¶52}** Unlike our review of the sufficiency of the evidence, an appellate court's function when reviewing the weight of the evidence is to determine

whether the greater amount of credible evidence supports the verdict. *Thompkins*, *supra*, at 387. In reviewing whether the trial court's judgment was against the weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *Id.* In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387.

{¶53} After the State rested its case, Curry took the stand himself to testify on his own behalf. Curry first testified to having a number of prior convictions, including a prior Gross Sexual Imposition and multiple drug-related convictions. Curry then testified as to how he met Pam, agreeing with her testimony that they met online through "Plenty of Fish."

{¶54} Curry testified that around October 12, 2012, he went to Pam's residence and they went out to breakfast to the Waffle House. Unlike Pam's testimony, Curry testified that they then returned to Pam's apartment and that he did some repairs on Pam's computer to fix her corrupted operating system. Curry testified that while a program was running on the computer, he and Pam went into the bedroom. Curry testified that while in the bedroom he performed oral sex on

Pam, and that she tried to perform oral sex on him but she could not. (Tr. at 280). Curry testified that they then had sex, though afterward they talked about getting some lubrication for the next time. (*Id.* at 282). Curry testified that he came back to Pam's residence the next day and they again had sex. (*Id.* at 283).

{¶55} Curry testified that he next came to Pam's residence a couple weeks later and when he arrived he had a talk with Pam about her concerns related to a potential relationship. Curry testified that after about a forty-five minute conversation, they went into the bedroom and both undressed. Curry testified that he then used lubrication and they had consensual sex. Curry testified that it was the third time they had consensual sex altogether.

{¶56} Curry testified that after he and Pam had sex that day, she became distraught, particularly after Curry received a text message from "Patricia from Fostoria." (Tr. at 296). Curry testified that after he received the message, "all hell broke loose." (Tr. at 297). Curry testified that the two started arguing, that Pam called him "dirty" and that he started to leave. (*Id.*) Curry testified that he mentioned gas money as he was leaving, which he claims Pam promised him for coming down, and that Pam would not give it to him. Curry testified that he did verbally threaten Pam's car if she did not give him any money, but he testified he did not threaten Pam or her family with harm. Curry testified that Pam eventually came out and gave him the money, and told him to leave.

{¶57} Curry testified that he called Pam a few times after the incident, and received texts from Pam's daughter. Curry testified that Pam called him once and they talked about meeting. Curry testified that he stopped calling Pam after Pam's daughter requested that he stop calling.

{¶58} Curry testified that it was his idea to take a polygraph examination, and that he talked with Detective Stechschulte about taking it. Curry testified that he had previously taken two, and that he was confident he would pass. (Tr. at 331-333).

{¶59} At the conclusion of Curry's testimony, he rested his case. The State then recalled Detective Stechschulte on rebuttal, who reemphasized that Curry was "eager" to take the polygraph examination. Detective Stechschulte also testified that since he had worked with Pam she had not been inconsistent in her story.

{¶60} After Detective Stechschulte's testimony concluded, the State rested and the case was submitted to the trial court for its determination. The trial court recessed to consider the matter, then returned and announced its decision in open court. After giving some preliminary remarks, the trial court conducted the following analysis.

> **Let me first address [Pam]. I determine and find that her status and situation at the time of the events which bring us here today were nothing short of one of the most traumatic events someone would experience in their life. The defense concentrated on those circumstances that were initially reported to Amy Glanemann of the Lima Police Department and I think when**

one considers the situation or status that she found herself in of extreme embarrassment because of her age, the traumatic nature of the circumstances, frankly the stigma if you will that I think is perceived with regard to circumstances that her behavior is reasonably explained initially after the events and particularly through the point she talked to officer Glanemann.

Her actions later probably speak far louder as it relates to her conduct at work, albeit that was before Glanemann's involvement, but nevertheless it's very telling when one considers the description of her situation, the circumstances at the hospital. And when one reflects on everything that happened by the time she saw Dr. [sic] Stechschulte and had a chance to digest and consider all that I've mentioned I think her credibility is very, very difficult to overcome and not – if not impossible to overcome. I find that [Pam] was extremely credible and I will stand by that proposition.

On the other hand, with regard to Mr. Curry. I think the way he testified and simply the fact that he had nearly a year to consider all of the ramica – and the ramifications of what he was dealing with here in Lima, Ohio, particularly when [Pam's] daughter advised him early on that this was a rape possibility, at least a possibility as he viewed it, he became a calculating individual whose credibility significantly has to be considered.

His testimony appeared to the court to be virtually rehearsed and it was done with the setting or in the setting of a background of experiencing and facing a terrible criminal record that would be very difficult to explain as it relates to his credibility and that lack of credibility was substantiated by the polygraph examination that left little or no doubt with respect to the support for the proposition that he was calculating, dishonest, and has in his own mind an ability to believe he can deceive. And I think that is what came across from the evidence in this case.

Therefore, the Court is going to determine that the State of Ohio in Count 1 of the Indictment did prove with evidence

> **beyond a reasonable doubt that Robert Curry did commit Rape
> * * * [.]**
>
> **As to Count 2 the Court is going to find Mr. Curry Guilty[.]**
> * * *

(Tr. at 412-415).

{¶61} Curry now argues on appeal that his convictions for Rape and Robbery were against the manifest weight of the evidence. Specifically, Curry contends that this case is essentially a "he-said," "she-said," and that *if* both witnesses were given equal credibility, the State would not have been able to prove its case beyond a reasonable doubt.

{¶62} Curry further argues that Pam was not credible because she had initially told the first officer she spoke to that she did not know Curry was coming over the morning of the alleged incident, and that Curry took her pants off before raping her. Curry contends that since Pam later changed her story on these two issues, and others, as Curry claims, Pam's testimony was not credible.

{¶63} Contrary to Curry's arguments that Pam was not credible or that she and Curry should have been given equal credibility, the trial court specifically found Pam credible. The trial court recognized that when Pam spoke to Officer Glanemann, Pam was not as forthcoming as she later was with Detective Stechschulte. The trial court found that Pam's reasoning not for being as forthcoming, and initially lying, was credible. Detective Stechschulte had also

testified that Pam's early discrepancies were not uncommon with rape victims because they are embarrassed or can feel as though they are to blame.

{¶64} Notably the trial court not only found Pam specifically credible, but it also specifically found Curry not to be credible. Based on Curry's criminal history and the polygraph examination, which indicated Curry was being deceptive, the trial court did not believe Curry's story.

{¶65} Curry seems to suggest on appeal that in any he-said, she-said case where there are only two witnesses, equal weight should be given to both witnesses and thus the State should never have enough to prove its case beyond a reasonable doubt. However, this ignores a trial court's ability to hear and believe the testimony of a single witness. "In either a criminal or civil case the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230, 231, (1967). Moreover, such a stance would make it virtually impossible to convict someone where there was only a single witness to a crime provided the perpetrator could come up with any contradictory story.

{¶66} In this case Pam testified to her version of events surrounding the Rape and the Robbery and the trial court found them credible. As credibility is a determination best left to the trier of fact, we cannot find that Curry's convictions

are against the manifest weight of the evidence. Therefore, Curry's third assignment of error is overruled.

*First Assignment of Error*

**{¶67}** In Curry's first assignment of error, he argues that he received ineffective assistance of counsel. Specifically, Curry contends that his attorney advised him to take a polygraph examination and to stipulate to the admissibility of the results at trial. Curry contends that the inherent unreliability of polygraph examinations effectively renders an attorney's advice to undertake such an examination, and stipulate to the admissibility of the results at trial, ineffective assistance of counsel.

**{¶68}** "Reversal of convictions on ineffective assistance requires the defendant to show 'first that counsel's performance was deficient and, second that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial.' " *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751 at ¶105, quoting *Strickland v. Washington*, 466 U.S. 668, 669, 104 S.Ct. 2052 (1984). When considering a claim of ineffective assistance of counsel, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. A tactical decision by trial counsel, who as a licensed attorney is presumed to be competent, is not by itself enough to show ineffective assistance of counsel simply because

the strategy did not result in an acquittal. *State v. Clayton*, 62 Ohio St.2d 45, 48-49 (1980); *State v. Timm*, 3d Dist. Seneca No. 13-11-23, 2012-Ohio-410, ¶ 31.

{¶69} In this case Curry claims that his counsel was ineffective for advising Curry to undertake a polygraph examination. Despite Curry's claim on appeal that his counsel was ineffective for "advising him" to take the polygraph exam, all of the testimony at trial indicated that the exam was undertaken at Curry's insistence. Detective Stechschulte testified that it was Curry's idea to take a polygraph examination. Cindy Erwin, the polygraph examiner, testified that Curry was confident going into the examination and that he was given a chance to refuse to take it, but elected not to do so. Curry himself specifically testified that he really wanted to take the polygraph examination and that it was his idea to do it. Curry testified that he was confident regarding the test and that he had taken two polygraph examinations previously in his life.

{¶70} Curry's arguments on appeal that his counsel was ineffective for allowing him to take a polygraph examination now seem disingenuous given that he so explicitly wanted to take the polygraph examination. This is especially true given that two of the three possible outcomes of the polygraph examination would not have been detrimental to his case. In the stipulated agreement for Curry to take the polygraph examination, the State agreed that if Curry's answers were not indicative of deception, the State would *dismiss the Rape charge against him with*

*prejudice*. (Doc. No. 19). That outcome would clearly be *extremely* favorable to Curry. If the results of the polygraph examination were inconclusive, the stipulated agreement stated that no testimony regarding the exam or its results would be presented at trial. Only if Curry "failed" the examination would it be detrimental to him. Curry's argument on appeal that this Court should create a rule that counsel is ineffective *per se* any time that a defendant elects to take a stipulated polygraph examination would improperly preclude criminal defendants like Curry from making an agreement that could result in their charges being dismissed with prejudice.

{¶71} Moreover, there is no indication anywhere in the record that Curry's attorney specifically advised him to undergo the polygraph examination. Curry clearly wanted to take the polygraph exam and he was notified time and time again that he could back out of the agreement without any adverse consequences, even up until the test actually began.

{¶72} Nevertheless, even if Curry's trial counsel did advise Curry to take the polygraph examination, Curry's trial counsel clearly made sure that the prosecutor and the trial court complied with the strict guidelines the Ohio Supreme Court created in *State v. Souel,* 53 Ohio St.2d 123 (1978), for the introduction of a polygraph examination at trial.

{¶73} In *Souel*, the Ohio Supreme Court held that the results of a polygraph examination are "admissible in evidence in a criminal trial for purposes of corroboration or impeachment" provided certain specified conditions are observed. *Souel* at syllabus. Those conditions include, *inter alia*, that, "The prosecuting attorney, defendant and his counsel must sign a written stipulation providing for defendant's submission to the test and for the subsequent admission at trial of the graphs and the examiner's opinion thereon on behalf of either defendant or the state." *Id*. In addition, *Souel* requires that the examiner be fully subject to cross-examination, and that the results of the examination must not be considered to prove or disprove any element of the crime. *Id*.

{¶74} In this case the parties did enter into a stipulated agreement as is required under *Souel*. Curry was also able to fully cross-examine the polygraph examiner, and there was no indication that the trial court considered the polygraph for anything other than credibility. The State and the trial court thus appeared to be in clear compliance with *Souel* and there is no indication that a different attorney could have more effectively proceeded under the circumstances or that the outcome at trial would have been different. Furthermore, we note that the law presumes that in a bench trial the court considers only relevant, material, and competent evidence. *State v. Post*, 32 Ohio St.3d 380, 384 (1987).

{¶75} In sum, polygraph examinations are only admissible at trial for the very limited purpose of establishing or attacking credibility. We cannot find in this case that Curry's counsel was ineffective for allowing Curry to take a polygraph examination when Curry was so adamant that he wanted to take it and was so adamant in his belief that he would pass, particularly given the State's offer to dismiss the Rape charge against Curry if Curry "passed." Therefore we cannot find that Curry received ineffective assistance of counsel. Accordingly Curry's first assignment of error is overruled.

*Second Assignment of Error*

{¶76} In Curry's second assignment of error, he argues that the prosecutor engaged in misconduct while questioning Pam on direct-examination by improperly "bolstering" Pam's credibility and that the trial court erred in overruling defense counsel's objection to the prosecutor's questioning. In addition, Curry contends that the prosecutor also improperly referenced the same subject matter, and Pam's responses, during the State's closing argument.

{¶77} "The two fold test for prosecutorial misconduct is whether the prosecutor's conduct at trial was improper and whether it prejudicially affected the substantial rights of the defendant." *State v. Holbrook*, 6th Dist. Huron No. H-14-003, 2015-Ohio-4780, ¶ 32, citing *State v. Lott,* 51 Ohio St.3d 160, 165 (1990). A prosecutor's conduct during trial cannot be grounds for error unless the conduct

deprives the defendant of a fair trial. *State v. Apanovitch,* 33 Ohio St.3d 19, 24 (1987). Thus, a reversal for prosecutorial misconduct is not warranted unless it is clear that the outcome of the trial would have been different but for the misconduct. *State v. Smith,* 14 Ohio St.3d 13, 15 (1984). In reviewing closing arguments for prosecutorial misconduct, we view the remarks in the context of the entire closing argument. *State v. Treesh,* 90 Ohio St.3d 460, 464 (2001).

{¶78} In this case, near the end of Pam's direct-examination, the prosecutor asked her if she wanted to be in court that day testifying. Pam testified that she did not and that she could not imagine anyone that would want to do it, but she felt like it was something she had to do. (Tr. at 58). The prosecutor asked why Pam felt like she had to do it, and Pam testified that she was "violated and I don't want anyone else to be violated. And I don't want my family hurt." (*Id.* at 59).

{¶79} After this exchange, the following dialogue occurred between the prosecutor, Pam, the court, and defense counsel, which Curry argues constitutes prosecutorial misconduct.

> **Q [PROSECUTOR]: * * * Now, Pam, Did I ever give you a chance to walk away from all of this?**
>
> **A [PAM]: Yes, You did.**
>
> **Q: Tell the court what I offered you.**
>
> **[DEFENSE COUNSEL]: Objection. How is that relevant?**

**[PROSECUTOR]: It's relevant because he's acting like through his opening statement that she is lying about this and she has motives to lie about this so I'm taking those motives away, Your Honor. It's entirely relevant.**

**THE COURT: \* \* \* The objection will be overruled. This is typical in the sort of the situation where there's a reluctance for someone to come forward and the court believes it's – it – it – it is probative and will permit it. \* \* \***

**\* \* \***

**[DEFENSE COUNSEL]: Is it – Excuse me, Judge. Is it probative because it tends to show her truthfulness or probative because [the prosecutor] believes it would bolster her case?**

**[PROSECUTOR]: It's not about bolstering, Your Honor.**

**THE COURT: It's about what – it's probative. What lean – what leads to determination of the facts in the case. And your opening statement she's correct about. You indicate misrepresentation and not telling the full story at various times. And this buttresses the proposition that the full story will be told.**

**\* \* \***

**A [PAM]: You told me that when I was in your office that you offered me the chance to give up and walk away and there would be no charges against me or any retaliation or anything against me and did I want to take that. And I said no.**

**Q: Why not?**

**A: Because, I wanted to have my say and because I'm terrified of this man and I want him to be punished for what he did to me and for the threats he made to my family and –**

**[DEFENSE COUNSEL]: Objection. Continuing objection to this testimony.**

-32-

**THE COURT: It will be noted.**

**Q: Basically, you want him held accountable?**

**A: Yes.**

**Q: Okay.**

(Tr. at 59-61).

{¶80} Curry argues that the preceding line of questioning by the prosecutor was objectionable and that it constituted prosecutorial misconduct. Curry claims that at this point in the trial Pam had not been cross-examined and her credibility had not yet been attacked by defense counsel. Curry claims that this line of questioning improperly bolstered the State's witness's testimony. We note that Curry cites no legal authority to establish that a preemptive line of questioning directed to the victim's motivations to testify truthfully was improper, let alone that it would rise to the level of prosecutorial misconduct.

{¶81} The State argues that the questioning in this particular case was little different from a situation where a prosecutor asks a witness who is testifying in exchange for a plea deal in another case why that witness is testifying against a defendant. In the context of plea-bargain arrangements, the Supreme Court of Ohio concluded in *State v. Cornwell*, 86 Ohio St.3d 560, 571 (1999), that prosecutorial questions on that topic were not improper and did not prejudicially affect substantial rights of Cornwell because "[t]he questions concerning the plea

bargains were brief, not overly emphasized, and were made at the close of the prosecutor's examination of each witness." *Cornwell* at 571. Other courts have deemed the prosecutor's questioning in plea-bargaining circumstances permissible, particularly where the prosecutor never states any personal observations or opinions as to the witness's truthfulness. *See United States v. Trujillo*, 376 F.3d 593, 608 (6th Cir.2004).

{¶82} We do not find the circumstances in this case precisely analogous to questioning a witness regarding a plea bargaining deal as the State suggests. Nevertheless, the testimony elicited by the prosecutor from the victim pertaining to an "offer" by the prosecutor that would allow the victim to walk away from the case without any consequences was brief, not overly emphasized, and at the end of the prosecutor's examination of the victim. In addition, the prosecutor did not at this point, specifically "vouch" for Pam's credibility. The prosecutor similarly did not offer any personal observations or opinions as to the veracity of Pam's claims. *Id.* As a result, we cannot find that it was erroneous in this case, or even if the direct-examination of Pam was erroneous, that it altered the outcome of the trial.

{¶83} At the same time, we would also express concern that any preemptive introduction of an out-of-court conversation between a prosecutor and a victim carries an implicit risk of interjecting the *prosecutor's* motivations and credibility assessment regarding the victim into the trial—which would be

improper. In this case, our concern is illustrated in the following portion of the prosecutor's rebuttal closing argument, which Curry also contends amounted to misconduct.

> **Let's talk about why [Pam] would lie about that. What on earth is her reason for lying? [Defense counsel] would tell you, I don't know. She got upset over their long distance relationship and the fact she saw some other woman on his phone. And she's going to put herself through everything I just described, some two years later, two years have gone by, and with the offer to walk away from it all. She was given that option. You want to walk away, you walk away. You want tell me this didn't happen. No perjury, no falsification, no nothing. You walk out this door and you don't have to look back.** *She could have walked out and no problems whatsoever because I would rather sacrifice that than to sacrifice an innocent man. I'd rather let somebody skate on a lying charge than lock up someone who didn't commit the crimes of Rape and Robbery.*
>
> **She got that offer. And what did she tell you? I couldn't. I know what he did to me. And what he did was wrong and he should have to answer for that. That's why two years later she came on that stand and swore to tell the truth and that's exactly what she did. And it didn't matter what he threw at her.**

(Tr. at 402-403).

{¶84} In the emphasized portion of the preceding statement the prosecutor is now interjecting her own character, practice, and motivations into what might be considered a somewhat questionable offer of immunity from prosecution for a complaining witness who might admit lying to police and originating false criminal charges against someone. Such a statement implicitly invokes the *prosecutor's* credibility as one who would not present the testimony of a victim

who the *prosecutor* believed was not being truthful. As such, the statement was improper and exceeded the boundaries of acceptable prosecutorial conduct. Nor do we find it to be excused as the result of any door being opened in defense counsel's closing argument because the State chose to preemptively open the subject on direct examination of the victim in the first place and thereby may have necessitated defense counsel raising it in closing argument and elsewhere in the trial.

{¶85} However, while we find that the prosecutor's statements in closing argument were improper, we cannot find that they had any prejudicial impact to the trial itself. First, this was a bench trial and "in a bench trial in a criminal case [we presume] the court considered only the relevant material and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary." *State v. Post*, 32 Ohio St.3d 380, 384 (1987). Second, there is no "affirmative" indication that the trial court relied upon the prosecutor's questioning or statements in reaching its decision to convict. Third, the trial court specifically and independently found Pam credible and specifically and independently found Curry not to be credible. Lastly, we cannot find that a few isolated comments by the prosecutor would rise to the level of prejudice. As a result, we cannot find that Curry was denied a fair trial, or that without the

statements and questioning of the prosecutor the outcome of the trial would have been any different.  Therefore Curry's second assignment of error is overruled.

{¶86} Having found no error prejudicial to Curry in the particulars assigned, Curry's assignments of error are overruled and the judgment of the Allen County Common Pleas Court is affirmed.

*Judgment Affirmed*

**PRESTON and WILLAMOWSKI, J.J., concur.**

**/jlr**