[Cite as *State v. Williams*, 2020-Ohio-3616.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## AUGLAIZE COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,                        CASE NO. 2-19-04

      v.

BRENT A. WILLIAMS,

                                             **O P I N I O N**

      DEFENDANT-APPELLANT.

---

**Appeal from Auglaize County Common Pleas Court**
**Trial Court No. 2018 CR 0151**

**Judgment Affirmed**

**Date of Decision:   July 6, 2020**

---

APPEARANCES:

    *David H. Thomas and Kathryn S. Wallrabenstein* for Appellant

    *Benjamin R. Elder* for Appellee

**SHAW, P.J.**

{¶1} Defendant-appellant, Brent A. Williams ("Williams"), brings this appeal from the June 11, 2019 judgment of the Auglaize County Common Pleas Court sentencing him to fifteen years to life in prison after Williams was found guilty in a bench trial of Murder in violation of R.C. 2903.02(B), an unclassified felony. On appeal, Williams argues that there was insufficient evidence presented to convict him, that his conviction was against the manifest weight of the evidence, and that he received ineffective assistance of counsel.

*Background*

{¶2} On July 26, 2018, Williams was indicted for (Count 1) Murder in violation of R.C. 2903.02(A), an unclassified felony, (Count 2) Murder in violation of R.C. 2903.02(B), an unclassified felony, and (Count 3) Tampering with Evidence in violation of R.C. 2921.12(A)(1), a felony of the third degree. The two counts of Murder were in the alternative—the first alleging that Williams purposely caused the death of his wife and the second alleging that Williams caused the death of his wife as a proximate result of committing a Felonious Assault. More specifically, Williams was accused of killing his wife, Erin Mulcahy, by strangulation, and staging her body in the shower with the water running with the purpose to impair the value of evidence. Williams pled not guilty to the charges.

{¶3} On the day his trial was scheduled to begin Williams elected to waive his right to a jury trial and he proceeded to a bench trial. The trial proceeded from June 3, 2017, to June 7, 2017. At the conclusion of the evidence on June 7, 2019, the trial court heard closing arguments and recessed to consider the matter. The trial court announced its verdict on June 11, 2019. Williams was convicted of (Count 2) Murder in violation of R.C. 2903.02(B); however, he was acquitted of (Count 1) Murder in violation of R.C. 2903.02(A), and (Count 3) Tampering with Evidence in violation of R.C. 2921.12(A)(1).

{¶4} For his Murder conviction, Williams was sentenced to serve fifteen years to life in prison. A judgment entry memorializing the sentence was filed June 11, 2019. It is from this judgment that Williams appeals, asserting the following assignments of error for our review.

**Assignment of Error No. 1**
**The trial court erred and thereby deprived Appellant of due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and comparable provisions of the Ohio Constitution by overruling Appellant's motions for judgment of acquittal and in finding Appellant guilty of murder as the evidence at trial was insufficient to support Appellant's conviction.**

**Assignment of Error No. 2**
**The trial court erred in finding Appellant guilty of murder, as the verdict was against the manifest weight of the evidence, thereby depriving Appellant of due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and comparable provisions of the Ohio Constitution.**

**Assignment of Error No. 3**
**The cumulative effect of Appellant's trial counsel's failures deprived Appellant of his rights to a fair trial, the effective assistance of counsel, and due process of law as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution.**

*First Assignment of Error*

{¶5} In his first assignment of error, Williams claims that the trial court erred by denying his motions for acquittal because the State presented insufficient evidence to convict him.

Standard of Review

{¶6} An appellate court reviews the denial of a Crim.R. 29 motion for acquittal under the same standard used to review a sufficiency of the evidence claim. *State v. Anders*, 3d Dist. Hancock No. 5-16-27, 2017-Ohio-2589, ¶ 32, citing *State v. Carter*, 72 Ohio St.3d 545, 553, 1995-Ohio-104. "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus; *State v. Pountney*, 152 Ohio St.3d 474, 2018-Ohio-22, ¶ 19 (an appellate court's function in a sufficiency review is not to determine if the evidence *should* be believed). Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could

have found the essential elements of the crime proven beyond a reasonable doubt." *Id*., following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979); *State v. Ford*, --- Ohio St.3d ---, 2019-Ohio-4539, ¶ 317. "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33, citing *State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, ¶ 25 (1st Dist.); *see also State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997) ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence.").

## Controlling Statutes

{¶7} In this case, Williams was convicted of Murder in violation of R.C. 2903.02(B), which reads: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree[.]"

{¶8} The second degree felony offense of violence allegedly committed was Felonious Assault in violation of R.C. 2903.11(A)(1), which reads: "No person shall knowingly * * * [c]ause serious physical harm to another[.]" Serious physical harm is defined in R.C. 2901.01(A)(5) as,

**(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;**

**(b) Any physical harm that carries a substantial risk of death;**

**(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;**

**(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;**

**(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.**

Evidence Presented by the State

{¶9} Erin Mulcahy was found dead in the shower at her residence on July 8, 2017. Williams and Erin entered into a relationship approximately two years prior to her death. They were married about a year and three months before Erin died.

{¶10} Williams leased an apartment at 200 Karen Street in Waynesfield where the couple resided until July 2, 2017, when Williams left due to Erin's excessive drinking. By all accounts, Erin had a serious problem with alcohol abuse. She had been to rehab numerous times and she repeatedly relapsed once released from rehab. Erin had even been hospitalized on multiple occasions both for extreme alcohol consumption and for withdrawals that were purportedly giving her seizures.

{¶11} Prior to Williams' decision to leave the residence at 200 Karen Street on July 2, 2017, the relationship between Williams and Erin was tumultuous. Police had been called with regards to domestic disturbances at their residence, Erin had at least one affair, she was in and out of the hospital for her alcohol-related problems, and Erin and Williams apparently argued enough that they had a handwritten contract in March of 2017 stating that Williams would not yell at Erin. By July 2, 2017, Williams claimed he had enough and called a family member to pick him up and he left the residence in the late afternoon. On the night Williams left, phone records show that Erin made eight calls to Williams, leaving him six voicemails, and she sent him a text message stating "Have a nice life."

{¶12} The next day, July 3, 2017, Erin called Williams and left him a voicemail at 6:36 a.m. At 9:59 a.m., Erin messaged Williams stating, "I need the key or I will have the locks changed[.]" A minute later she added, "Plus I am divorcing you." Throughout the rest of the day, Williams and Erin exchanged phone calls, voicemails, and a few text messages. They spoke on the phone over ten times totaling in excess of an hour, though the content of those calls is unknown.

{¶13} Meanwhile, on July 3, 2017, Erin was on the dating site Plenty of Fish. She exchanged messages with Christopher S., whom she had not known previously. Christopher agreed to drive to Waynesfield from Tiffin and pick up some alcohol for Erin, specifically two "tall boys" of beer. (Tr. at 396). After arriving at 200

Karen Street, Christopher and Erin spent some time chatting, then they engaged in consensual vaginal intercourse in Erin's bedroom. Christopher indicated that he wore a condom, and that he disposed of it in the outside garbage when he left shortly thereafter. Christopher stated that he was at Erin's residence for approximately two hours in the evening, and that after he left he had no further contact with her.[1]

{¶14} On the morning of July 4, 2017, Erin left Williams a voicemail. A few hours later Williams left Erin a voicemail, but they had no further phone contact that day.

{¶15} On the morning of July 5, 2017, Williams went to work from 5:56 a.m. to 2:00 p.m. Williams worked at PPG Coating as a production laborer and had janitorial duties. Erin sent Williams a text message at 12:25 p.m. stating, "Hey [c]an you call when you have a chance? I haven't drank since you left." Williams called Erin a few minutes later and they spoke for over eight minutes. At some point after Williams left work on July 5, 2017, Williams provided a check to the Village of Waynesfield for a water bill and he presented that check to the Village. Erin next contacted Williams around 4:30 p.m., leaving two voicemails. Then she began texting him asking if he was going to call her.

{¶16} Around this time, Scott Bowsher, the owner of the apartment at 200 Karen Street, spoke with Erin at her residence. Scott told Erin that she needed to

---

[1] Notably, there was a gap in phone communication on July 3, 2017, between Williams and Erin from 7:20 p.m. to 10:15 p.m.

move out because Williams was the only person on the lease and Williams had moved out. Scott also stated that rent had not been paid and Erin had a cat, which was against the terms of the lease. Scott told Erin that she had 24 hours to leave the premises.

{¶17} At 5:24 p.m., Erin sent Williams a text message stating "the landlord just told me I have to move out." She asked Williams to call her. Over the next half hour, Erin made three calls to her father and three calls to Williams, none of which Williams answered.

{¶18} At 5:56 p.m., Erin began sending Williams text messages again, first asking if Williams had paid the rent, then asking Williams to call her, adding, "I'm not going to bug you about coming back tonight." At 6:14 p.m. she made a call to Williams and left a voicemail, then she sent him a text message asking why he would not talk to her. She sent him a picture message at 6:34 p.m. and left Williams another voicemail at 6:35 p.m.

{¶19} At 6:39 p.m., Erin made an eight minute phone call to Kirk S., who had been a friend and lover prior to Erin and Williams' marriage. Kirk testified that Erin was frustrated and panicking about having nowhere to go and about not being able to move out of 200 Karen Street in a day. Kirk tried to reassure her that an eviction process would take longer, and Kirk testified that Erin had calmed down

by the end of the call. Kirk was the last person who spoke to Erin while she was alive.

{¶20} There was no further outgoing communication from Erin's phone.

{¶21} Between 6:18 p.m. and 8:35 p.m., Williams' phone showed him as being in the general area of 200 Karen Street in Waynesfield, though data could not show he was at the residence. Cell site tracking showed Williams near different areas of Lima throughout the day, but during these hours he was in the relative area of the residence he previously shared with Erin. Despite Erin's and Williams' phones typically being fairly active, neither phone transmitted any data between 6:48 p.m. and 7:32 p.m.

{¶22} At 7:32 p.m., Williams sent Erin a text message that said, "Why don't u [sic] let me get u [sic] pregnant[?]" At 8:22 p.m., Williams sent a message simply saying, "Hello" to Erin.

{¶23} On July 6, 2017, Williams worked from 5:56 a.m. until 2:02 p.m. During the day, he called Erin three times between 10:59 a.m. and 11:14 a.m., leaving two voicemails. Over the next forty-five minutes Williams sent Erin three text messages stating that they needed to talk, that it was important, and that she had better contact him.

{¶24} At approximately 4:15 p.m., Williams and his father went to the residence at 200 Karen Street together. They went inside and stated that they heard

the shower running but they did not see Erin. Williams claimed he got his checkbook from the entertainment center and then left. On the way out of the residence, Williams and his father ran into the landlord, Scott Bowsher, who was working on renovating one of the connected apartments. The apartment at 200 Karen Street was part of a larger building that housed three apartments. The apartments shared a common utility room for water heaters and a breaker panel.

{¶25} Scott asked if Erin was inside the residence at 200 Karen Street because if she was not, he wanted to change the locks. Williams and his father indicated that Erin was inside in the shower and they had only come to grab some of Williams' things. Williams and his father then left the residence. At approximately 4:17 p.m., Williams sent text messages to Erin stating "Did u have a nice shower" and "I was there while u was in the shower[.]" Williams did not attempt any further contact with Erin that evening.

{¶26} On July 7, 2017, Williams worked his shift from 5:56 a.m. until 2:00 p.m.. He sent Erin a text message at 1:47 p.m. stating, "U need to leave the apartment your dads [sic] check is not being accepted as rent[.]"

{¶27} On that same date, Williams sent a message to Ruth O. Ruth had known Williams for about three years. Williams asked Ruth if he could see her, and Ruth said no because he was married. Williams responded by stating that he was

not married anymore. Ruth replied that she was sorry to hear that but she was not interested.

{¶28} Another woman, Sandra B., testified that Williams sent her a message on July 7, 2017. Sandra stated she had not heard from Williams for over a year. She stated that Williams came to her residence on July 7, 2017, and was insistent that he stay the night. While Williams was at Sandra's residence, he talked about Erin, complaining about marital issues and stating that he and Erin were separated. Sandra thought Williams was anxious and acting unusual. She allowed Williams to stay that night with her but they did not engage in any sexual activity.

{¶29} On July 8, 2017, Scott Bowsher went to the apartment connected to Erin's residence to continue renovation work. While he was there, he noticed that the sump pump was running. He used the crawl space under the building and determined that water was coming through the floor from Erin's apartment. He shut the water off to the apartment using the common utility room, and then Scott tried to call Williams so that he could get permission to enter the apartment. When Scott could not get in touch with Williams, Scott called Williams' father and stated that he needed permission to enter the apartment. Williams' father said he would be over in a couple of minutes to go inside with Scott.

{¶30} When Williams' father arrived at 200 Karen Street shortly thereafter, he went inside the residence with Scott after Scott unlocked the door. Upon

reaching the bathroom, Scott realized that Erin's body was in the bottom of the stand-up shower. He immediately dialed 911.

{¶31} First responders arrived at the scene and it was clear that Erin was deceased. She was thirty-five years old when she died. In the event that Erin's death was not natural, other officers responded to the scene to investigate. In addition, a crime scene analyst from BCI, and a certified death investigator/coroner's assistant came to inspect the scene.

{¶32} Witnesses did not recall an odor of decomposition in the bathroom where Erin's body was found. The BCI analyst and the coroner's assistant each took photographs of the scene, finding Erin on her side in a fetal position at the bottom of the stand-up shower. The magnetic glass door to the shower was closed. Witnesses noticed that there was a towel on the toilet seat and clothes were laid out neatly on a hamper as though Erin had intended to get out of the shower. The coroner's assistant noted that Erin did not have rigor mortis, which he testified passed after a period of time.

{¶33} The residence was searched, with Williams' permission, and DNA swabs were taken from various areas. Officers also attempted to obtain fingerprints. There were no signs of a struggle in the residence or in the bathroom and no alcohol was located in the residence. There were also no signs of a forced entry.

{¶34} Erin's phone was in the living room on the couch. Erin's father came to the scene and officers were notified that she had a history with alcoholism and seizures, so Erin's father thought she might have had a seizure.

{¶35} Williams was interviewed outside of the residence while police were still searching inside. The interview was recorded on an officer's body camera. During the interview, Williams stated that he had not seen Erin since Sunday, July 2. (State's Ex. 18). He allowed officers to photograph the text messages he had exchanged with Erin since he left. The officer interviewing Williams had dealt with Erin in the past and he brought up Erin's alcoholism. Williams indicated that he ultimately left Erin because he did not want to deal with the alcoholism any longer.

{¶36} Williams was asked if Erin was taking her medication, and at that time Williams stated "that's why she had the seizure and died" because she refused to take the medication for alcohol withdrawal. (State's Ex. 18). He stated he had seen her have the seizures before. He also stated that Erin told him she stopped drinking because she wanted to reconcile. Williams indicated that his text regarding getting Erin pregnant was because she would not be able to drink if she was pregnant. Williams provided a DNA sample at the scene.

{¶37} Erin's body was transported to the Lucas County Coroner for an autopsy because the Auglaize County Coroner did not perform autopsies as he was not qualified in forensic medicine. The Lucas County Coroner, Dr. Diane Scala-

Barnett, was also a forensic pathologist. She testified extensively at trial regarding her findings in this case, noting that she was aware of Erin's history with alcoholism and her purported seizures.

{¶38} Dr. Scala-Barnett testified that from Erin's appearance she had been dead for 2 to 3 days prior to being found in the shower. Dr. Scala-Barnett testified that being under the cold water in the shower was a mechanism for preservation. She noted that hot water would have accelerated decomposition, but since Erin was in cold water her body was better preserved than it would have been otherwise. Dr. Scala-Barnett testified that Erin being in a fetal position in the shower was inconsistent with falling after a seizure.

{¶39} Dr. Scala-Barnett testified that Erin had injuries around her eye and chin that indicated she was struck or hit recent to the time of death. There was a "fairly extensive hemorrhage" in Erin's "gumline" that could have been from a blow to the mouth or from pushing against something that's over the mouth or chin. (Tr. at 632). Dr. Scala-Barnett testified that she specifically examined a section of the injury to insure that it was not actually from decomposition and she confirmed it was a "real hemorrhage" not an "artifact of decomp." (*Id.*)

{¶40} Dr. Scala-Barnett testified that there was also a hemorrhage inside of the eye that was in "no way part of decomposition." (Tr. at 633). She testified that the specific eye injury observed was common in "asphyxia deaths." (*Id.*) In

addition, Dr. Scala-Barnett observed "petechial hemorrhages" or "little tiny hemorrhages" that were seen in asphyxia deaths, but not associated "with seizure deaths." (*Id*. at 633-634). She indicated that petechiae were caused by pressure put on small vessels, "be it pressure around the neck, be it somebody sitting on a chest, be it any reason why there's an increased amount of intrathoracic pressure." (*Id*. at 634). Dr. Scala-Barnett testified that she observed "lots of little tiny petechiae all over" stopping at the neck because that was where the pressure would have been placed. (*Id*. at 635). According to Dr. Scala-Barnett, a chokehold would cause petechial hemorrhaging but not a seizure.

{¶41} Dr. Scala-Barnett also testified that there was a bruise on Erin's right shoulder. Further, she identified a "hemorrhage in the epiglottis, [a] very difficult area to get hemorrhage in, plus it's very protected by all this (indiscernible) on the outside. We see this kind of injury in a strangulation." (Tr. at 638). She testified the injury would not be caused by a seizure because there was no reason to have pressure placed on the neck.

{¶42} Dr. Scala-Barnett testified that the "hyoid" bone was very important in strangulation because it would frequently get broken if there was a "side-to-side compression" but the hyoid bone did not have to be broken in a strangulation. Dr. Scala-Barnett testified that although Erin's hyoid bone was not broken, there was a hemorrhage right over the bone, "right here in the center. There should be no

hemorrhage anywhere like this in the neck with a seizure, or any other reason." (Tr. at 638).

{¶43} Dr. Scala-Barnett identified another "hemorrhage at the base of the greater cornu" and a "hemorrhage in the epiglottis" both of which she said were very "characteristic of injuries associated with strangulation and not from decomposition or seizures."[2] (*Id*. at 639-640).

{¶44} As a result of her findings, Dr. Scala-Barnett determined that Erin had died of strangulation. She summarized the findings that led her to this conclusion, including: the hemorrhage on the right side of the epiglottis, the hemorrhage at the base of the cornu, a focal hemorrhage "in the strap muscles," a hemorrhage in the midline over the hyoid bone, bruising in the mouth at the gumline, a bite mark impression on the tongue[3], sclera in the conjunctiva of the eye, and bulbar hemorrhages and petechiae on the neck. (Tr. at 642-643). Dr. Scala-Barnett testified that she made an incision into the back of the neck looking for hemorrhage in the deep muscle and did not find it, which was significant because it told her that when Erin was being strangled, the pressure was not applied to the back of the neck. (*Id*. at 643).

---

[2] The State alleged that Williams strangled Erin and moved her body into the shower, constituting the Tampering with Evidence charge. The State supported this theory by the fact that the body was in a neat fetal position and because there were fly eggs on Erin's perineum. Since Erin's legs were closed and the water was on, Dr. Scala-Barnett testified flies would not enter and lay eggs there, leading to the conclusion that the body had been moved.

[3] Dr. Scala-Barnett did testify that the tongue bite could happen during a seizure but it also occurred in strangulation because pressure on the neck pushes the tongue out. (Tr. at 643).

{¶45} Dr. Scala-Barnett testified that there were different ways that a person could be strangled. She described multiple ways that did not comport with the evidence here; however, she stated a chokehold with one arm across the neck would cause injuries to the front of the neck with no hemorrhages to the back of the neck, similar to here. Another method of strangulation that she felt was consistent with the evidence was a "carotid sleeper" where the "chin is in the crease of the arm and all you need is a little pressure" to make it tight. (Tr. at 645).

{¶46} Dr. Scala-Barnett testified that strangulations can kill by pressing the trachea together, closing off the airway, or closing off the blood flow to and from the brain. Dr. Scala-Barnett testified that in a "carotid sleeper" a person would lose consciousness as quickly as between five to eight seconds, limiting any ability to fight back. (Tr. at 645). Dr. Scala-Barnett testified that she believed that Erin died from either a carotid sleeper or a chokehold. She indicated that she could not disprove a single arm strangulation either. She testified that a carotid sleeper in particular would be consistent with some of the injuries here such as the chin and tongue. Dr. Scala-Barnett testified to a reasonable degree of medical certainty that Erin died of strangulation.

{¶47} As part of the autopsy, Dr. Scala-Barnett took blood and urine samples. In addition, she also took vaginal, oral, and anal swabs. The samples and swabs were sent out for testing. Erin's blood did not contain any alcohol but it had

trace amounts of diazepam, nordiazepam, and promethazine. Nordiazepam was a metabolite of diazepam, which was a minor tranquilizer. A toxicologist testified that diazepam was used for anxiety and was also effective as an anticonvulsant for people with seizures or at risk for seizures.[4] The amount of diazepam/nordiazepam present were less than therapeutic levels. In fact, while the amount was enough to detect, it was in such a small quantity that it could not be measured. Further, the toxicologist stated that based on the amount of diazepam in Erin's blood Erin had taken either a very small dose of it closer to death or she had last taken a dose at a more distant time. The toxicologist indicated that the promethazine that was present in Erin's blood was an antihistamine, also in a very small amount.

{¶48} The vaginal swab that had been taken and tested revealed the presence of semen and sperm tails. DNA samples were extracted and the sperm DNA was consistent with Williams' DNA at a rate rarer than 1 in 1 trillion, with no other contributors identified.

{¶49} There was a significant amount of testimony about the presence of the sperm "tails" and how long they could potentially survive in a live person versus a dead person because Williams eventually claimed that he had sex with Erin before he moved out of the residence on July 2, 2017. Dr. Scala-Barnett testified that in a living person sperm tails could survive 24-36 hours; however, if a person was killed

---

[4] Testimony indicated that there was up to a 25 percent mortality rate for individuals withdrawing "cold turkey" from alcohol without medical advice.

close to the time the sperm was deposited, the tails would not decompose until the body started to decompose.

{¶50} A forensic scientist from BCI testified that that sperm tails only last eight to twelve hours in a living individual. "They are the first things that usually break off once they are deposited inside a body cavity." (Tr. at 609). He testified that sperm heads could last up to 72 hours and seminal fluid for up to about 96 hours. (*Id*. 615)

{¶51} The Auglaize County Coroner reviewed the evidence in this case, including specifically Dr. Scala-Barnett's autopsy report, evidence from the scene, Erin's medical history, and he concluded that Erin died of strangulation on July 5, 2017, between 6:45 p.m. and 7:32 p.m.

{¶52} Once the coroner ruled Erin's death a homicide, police searched the residence at 200 Karen Street again. The residence had been sealed after the last search when Erin was found, and the second search was conducted July 10, 2017. Chief Motter of the Waynesfield Police Department testified that he was initially surprised by the news that Erin's death was a homicide because they had not really detected signs of "foul play" in the residence.

{¶53} Search warrants were obtained for the phones of Williams and Erin. Extractions were performed on the phones to get the call and messaging history. Location information for the phones was then retrieved. In addition, officers

obtained phone records from numerous people including, *inter alia*, Christopher S. and Kirk S.

{¶54} On July 11, 2017, Chief Michael Peterson of the Auglaize County Sheriff's Department received a phone call from Williams, which was recorded. On the phone call, Williams expressed anger that his phone had been seized, stating that it cost him $240 to get out of his phone contract and turn the phone off. He stated that the phone had been deactivated and that it would not work any longer. Williams stated that he felt like the police were "against" him, and that they approached him in an unprofessional manner. (State's Ex. 9).

{¶55} Chief Peterson stated that he thought Williams of all people would want answers regarding Erin's death and Williams responded that he already knew the answers and he already knew how Erin died. He stated that he had nothing to hide, that he was gone when Erin died, and that he had not been to her residence for 3-4 days prior to her death. He then began offering alibi witnesses stating that his parents would vouch for him, and that his brother would as well. He claimed that he had all the witnesses he needed to show he was not present when Erin died.

{¶56} Further, Williams claimed that "everybody" knew Erin had a drinking problem, and that she ultimately consumed so much that her body could not take it any longer. (*Id.*) Williams said that Erin's mother had died from alcoholism and it was terrible that Erin's father was now burying a daughter for the same reason.

Williams stated that Erin was trying to stop drinking again, which caused seizures and that was what killed her. He stated that if he was at the residence he could have saved her life.

{¶57} Williams then spoke about feeling a "bond" with Erin that he had never had with anyone in his life but his parents. (State's Ex. 9). Williams stated that it really bothered him that he did not know how many days Erin was in the shower after she "seized," though he said he was "thinking" 2-3 days. (*Id*.) He said he thought what happened was that she bumped her head "hard" in the shower when falling from a seizure. (*Id*.) He claimed he was aware of the seizures because he had taken Erin to the hospital "every two weeks" when Erin was going through withdrawals. He stated he educated himself about alcoholism because of that.[5] (*Id*.)

{¶58} Chief Peterson stated that having more information about Erin's alcoholism was helpful since he did not know Erin at all prior to her death. Williams stated that he hoped Chief Peterson would remember what he said or write it down. Chief Peterson testified that he thought the conversation was odd and that he also thought that Williams offering alibi witnesses was strange at that point while they were still gathering evidence.

---

[5] A minor inconsistency surfaced through Williams' recounting of Erin's alcoholism. In his initial interview that was recorded on an officer's body camera he stated that Erin was once taken to the hospital and her BAC was .52, yet she was still walking and talking. On the phone call with Chief Peterson he cited the same or a similar incident but stated Erin's BAC was .42.

{¶59} As the investigation was ongoing, Williams began to contact other women. The day immediately after Erin's body was found Williams told Sandra B. that Erin had died of a seizure. Williams also contacted Ruth O. again, stating that he was not married any longer. He told Ruth O. that Erin had died of a seizure.

{¶60} Williams met a woman named Tiffany R. on Plenty of Fish a few weeks after Erin died. Tiffany met Williams at a park and they walked around together. Tiffany indicated that Williams spoke about how his wife had died from seizures and that Williams said he had a life insurance policy on her. Tiffany testified that she had a "weird" feeling about Williams because he did not seem to care that his wife was dead and he was already flirting and exchanging provocative pictures only three weeks after her death. Tiffany testified that she was suspicious that Williams had hurt his wife just based on the way he acted.

{¶61} During the course of the investigation it was uncovered that on June 1, 2017, Williams took out a life insurance policy on Erin in the amount of $25,000 through his employment. A representative from his employer did note that it was the first day Williams was actually eligible to sign up for benefits since he had started work on March 27, 2017. Williams signed up for other benefits at the same time.

{¶62} As the investigation continued into the proceeding months, Williams called the Auglaize County Sheriff's Department multiple times, the first being on

October 4, 2017. He stated he wanted "his shit," meaning his phone, that he was entitled to it, and that he was tired of the "games" from the police. (State's Ex. 37). Williams stated that he had called the coroner's office in Toledo and that the coroner's office "knew" there was no foul play, that "nothing happened to Erin," and that "she died in the shower" of a "seizure." (*Id.*) "I know it. You know it. There was no foul play. I want my shit. I'm tired of it." (*Id.*) Williams abruptly ended the call.

{¶63} The next call Williams made to the Auglaize County Sherriff's Department was October 12, 2017, wherein Williams stated that he wanted his stuff back again and that he had waited long enough. He said that apparently the police had nothing "on" him or they would have arrested him. He said he did not do anything wrong.

{¶64} Further, Williams stated that the coroner's office in Toledo had all their findings, that they knew the reason why Erin died; however, Williams said the coroner would not tell him. Williams stated that since coroner's office had made their findings he wanted his stuff back. He said, "If you know why she died, then [it's] over with, said and done, right?" (*Id.*)

{¶65} Williams then repeatedly stated that he should get his things back. "Apparently you ain't got nothin' on me or I'd be in jail, correct? Correct? Correct?

Correct? You don't have me in jail right? * * * Why ain't I? Why ain't I in jail? I'm asking you." (*Id.*)

{¶66} When the officer said he could not answer that question, Williams said, "Because I didn't do nothing. I did nothing wrong. And you know it. You know it." (*Id.*)

{¶67} The officer replied by stating that when the investigation was complete Williams' property would be returned to him. Williams responded, "Everything is said and done. I want it soon. This—This is over. They know why she passed away. And they know it wasn't from any foul play. They even told me that at the coroner's office in Toledo." (*Id.*)

{¶68} Williams said that the officer needed to call the coroner's office to get the cause of death and give him his stuff back so he could move on with his life. "How would you feel if your wife passed away and you knew the reasoning behind the death, like I know the reasoning behind the death, and you don't even believe a word I'm saying apparently, do you?" (*Id.*) Williams told the officer to get the death certificate to tell him why she died, then he hung up.

{¶69} Notably, Williams challenged the idea that he even *could* strangle Erin to death, first indicating that Erin was slightly taller than him and outweighed him by perhaps fifty pounds. Williams also had Erb's Palsy, which was a birth injury that impacted his right shoulder. Williams contended that Erb's Palsy and surgeries

made his right arm essentially useless. However, when Williams applied for his job at PPG Coating he acknowledged that he could lift and move up to 50 pounds on occasion and he stated he did not have any kind of disability.

{¶70} The State ultimately charged Williams with Erin's murder.

Analysis

{¶71} Looking at the evidence in the light most favorable to the State in this matter as we are directed on appeal, there was sufficient evidence to establish that Erin died as a result of strangulation. Dr. Scala-Barnett testified to a reasonable degree of medical certainty that Erin was killed by strangulation. In addition, Dr. Scala-Barnett went through the possible strangulation methods that were consistent with the evidence she found on the body. She also testified that in a seizure-related death, it would be unnatural for the body to fall into a relatively perfect fetal position.

{¶72} Further, Dr. Scala-Barnett testified that a chokehold could result in physical harm that carried a substantial risk of death and that being strangled to the point of unconsciousness would involve a temporary substantial incapacity. Both of these statements would satisfy the "serious physical harm" element of Felonious Assault, and the fact that Erin died from the strangulation leads to a reasonable conclusion that she died as a proximate result of a Felonious Assault. The findings made by Dr. Scala-Barnett were reviewed by the Auglaize County Coroner and he

agreed that Erin died by strangulation. Thus the evidence was sufficient to find that Erin died by strangulation. *See State v. McFeeture*, 8th Dist. Cuyahoga No. 100434, 2015-Ohio-1814, ¶ 45 (finding expert testimony regarding cause of death was sufficient to find victim died by chronic intoxication of a chemical found in antifreeze); *see also State v. Coleman*, 45 Ohio St.3d 298, 307 (1989) (testimony from coroner's office that cause of death was homicidal asphyxia sufficient to establish cause of death).

{¶73} The remaining question then is whether the State presented sufficient evidence that Williams was the individual who strangled Erin to death. To that end, the State established that Williams had a potential motive through the life insurance policy he had on Erin. Williams and Erin also had a tumultuous relationship and Erin had recently slept with other men, which also provided means of a motive.

{¶74} As to Williams' actual whereabouts at Erin's time of death, the State presented evidence that Williams was in the general area of 200 Karen Street through cell phone tower data. In addition, Williams' semen, containing sperm tails, was found inside Erin's vagina despite the fact that Williams claimed he had not had sex with Erin since July 2. If Williams had intercourse with Erin on July 2, 2017, as he said, the expert testimony indicated that the sperm tails would have been gone, at most, 36 hours later. However, if he had sex with her in closer proximity to her death, then the sperm tails could still be there when the body was found three

days later. This supports an inference that Williams not only in the area, but also with Erin. This is particularly true given that Williams had a key to the residence and the door was locked when he reentered with his father on July 6, 2017, to get his "checkbook."

{¶75} Moreover, Williams made several troubling statements in this case, repeatedly stating that Erin had died of a seizure while the matter was still being investigated. A woman he knew also thought he was acting anxious the day before Erin's body was found and when Williams called the police at one point he stated that he had talked to the coroner and was told that no "foul play" was involved, despite the fact that the coroner never made such a finding. Additionally, Williams also testified that he returned to 200 Karen Street with his father on July 6, 2017, to retrieve his checkbook. However, an employee from the Village of Waynesfield testified that Williams presented her with a check on July 5, 2017, indicating that he may have already had his checkbook. Thus the evidence places Williams with Erin, provides him with some motive, and his actions were suspicious.

{¶76} When analyzing the evidence in the light most favorable to the State, we find that there was sufficient circumstantial evidence to find that Williams was the individual who strangled Erin to death. *See State v. Franklin*, 62 Ohio St.3d 118, 124, citing *State v. Nicely*, 39 Ohio St.3d 147, 154-155 (1988) ("[a] conviction

can be sustained based on circumstantial evidence alone.").  Therefore, Williams' first assignment of error is overruled.

*Second Assignment of Error*

{¶77} In his second assignment of error, Williams argues that even if there was sufficient evidence presented to convict him, his conviction was against the manifest weight of the evidence.

Standard of Review

{¶78} In reviewing whether a verdict was against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony.  *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52.  In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.*

{¶79} Nevertheless, a reviewing court must allow the trier-of-fact appropriate discretion on matters relating to the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967).  When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State*

*v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

Evidence Presented by the Defense

{¶80} In his case-in-chief, Williams presented the testimony of Chad C., Rodney R., and Brad S., three individuals who met Erin through the dating site "Plenty of Fish."[6] Erin had contact with Chad during the first week of July, 2017—the week she died. She invited him to come over to 200 Karen Street but Chad testified he never went there.[7]

{¶81} Williams also presented the testimony of Erin's father, Jim Mulcahy. Jim testified that Erin was always "loaded" from drinking and that she had been to rehab five or six times. He testified that he had taken her to the hospital between three and five times when she was extremely drunk. He stated Erin suffered from seizures, though he never saw one, just the aftermath.

{¶82} Jim testified that he received a phone call from Erin on July 5, 2017, wherein Erin stated she was trying to get "straight" again. Jim told her not to do it by herself because it could kill her.

{¶83} Jim testified that Erin was bipolar. He stated that the last time he saw her was approximately a month before she died.

---

[6] Williams had a number of other witnesses under subpoena, but those witnesses were called by the State so they were examined on cross and released from their subpoenas.
[7] Erin did not have a car or any income.

{¶84} Dr. Werner Spitz, a forensic pathologist and the former chief medical examiner for Wayne County, Michigan, testified via a trial deposition. Dr. Spitz testified that he was 92 years old, that he had performed over 65,000 autopsies, that he had written nearly 100 scientific articles, and that he authored a textbook on forensic pathology. He indicated he had testified in all 50 states and was being paid $4,000 for his work in this matter.

{¶85} Dr. Spitz testified that he received medical records of Erin and Williams. He stated that from the records he thought Erin suffered from "Grand Mal" seizures, which caused contractions in every muscle in the body. He also received the autopsy report and photos to conduct his own evaluation; however, he did not personally examine Erin's body.

{¶86} Dr. Spitz testified that he thought given Erin's history, she had an alcohol withdrawal-related seizure, and that when she had a seizure she fell and hit parts of her upper body, creating some of the injuries seen.[8] At that time she also likely bit her tongue.

{¶87} In his testimony, Dr. Spitz disputed a number of Dr. Scala-Barnett's findings, claiming that many of the injuries Dr. Scala-Barnett observed could just as likely be from decomposition. Dr. Spitz produced a report that contained the following conclusions.

---

[8] Erin had been hospitalized for alcohol withdrawal-related seizures as recently as June 5, 2017.

> **The death of Ms. Mulcahy was obviously alcohol related. Her death was predictable. Nothing would have changed this outcome.**
>
> **The presence of hemorrhages as described in the autopsy report in the neck are insufficient to ascribe the death as one due to strangulation considering that blood vessels damaged in a fall on an edge or irregular surface will leak blood and give the impression of trauma.**
>
> **In summary, this woman, 35 year [old] alcoholic with heavy alcohol consumption history and alcohol withdrawal with seizures, nothing in this case justifies the conclusion that the manner of death in this case is homicide.**
>
> **The absence of defense wounds also supports lack of an attack.**
>
> **My opinions are based on my education, training and experience and are rendered to a reasonable degree of medical certainty.**

(Spitz Depo. Def.'s Ex. B). Dr. Spitz concluded his direct testimony by stating he thought there was more evidence needed for a determination of homicide. He felt there was more non-homicidal type of trauma than homicidal.

{¶88} During cross-examination in the trial deposition, Dr. Spitz was combative, though he acknowledged at certain points that he could not explain some hemorrhages, stating that they were minimal in any event. He stated that he saw what could be hemorrhages or decomposition. He testified that he would have to see microscopic slides to tell the difference, which he did not do in this matter, but Dr. Scala-Barnett did. (Spitz Depo. at 78).

{¶89} As to the evidence regarding Williams' semen being located in Erin's vagina, including still having sperm tails, Dr. Spitz broadly stated that "DNA" stayed for a long time and DNA could be there if they had sex three or four days prior. However, he did state that the first thing that sperm lost were the tails, and he did not make proclamations regarding sperm tails, just DNA in general.

{¶90} Williams was the last witness to testify in this case. He testified that Erb's Palsy impacted everything in his daily routine and that he had to compensate for his bad right arm. He stated he had adapted well but it was hard to find employment.

{¶91} Williams testified that he left Erin on July 2, 2017, because he did not want to be there any longer. He testified that her alcoholism and the arguments they had were too much for him. Nevertheless, he stated that he had sex with her the last day he was there.

{¶92} Williams testified that when he left the residence at 200 Karen Street he went to stay with his parents, which was about three miles outside of Waynesfield. He indicated that this likely explained why his phone was shown as in the cell tower area that covered Erin's residence on July 5, 2017.

{¶93} Williams testified he had observed Erin have 8-10 seizures in the past and that during them she would go limp. He testified she was in the hospital almost every other week.

{¶94} As to the life insurance, he stated that he applied for all benefits the first day of his eligibility. He stated that he took out the policy because he thought it would help cover Erin's future funeral expenses. He was wary of Erin's health since she had been in and out of the hospital so much, including being on a ventilator at one point. However, when pressed by the prosecutor, Williams acknowledged that he owed a lot of money on numerous bills and credit cards.

{¶95} Ultimately Williams stated that the last time he saw Erin in person was July 2, 2017. He testified that he did not kill her or move her body.

Analysis

{¶96} In arguing that his conviction was against the manifest weight of the evidence, Williams claims that the evidence does not support a finding that he was with Erin when she died, let alone that he caused her death. He also argues that his Erb's Palsy prevented him from actually having the ability to strangle Mulcahy to death. Further he contends that only some of the sperm had tails on them, indicating that if the State was correct that the tails started to degrade after 8-12 hours in a live woman, the State's timeline as to when Erin died would not have been accurate.

{¶97} In this case, the trial court was presented essentially with two theories: 1) Erin died from strangulation and that strangulation was perpetrated by Williams; and 2) that Erin had an alcohol-withdrawal related seizure in the shower, struck her head as she fell and died.

{¶98} To support his theory that Erin died of a seizure, Williams presented his own expert testimony in contravention of the State's expert. It was clear that Williams' expert, Dr. Spitz, was a highly accomplished individual; however, he did not actually physically examine the body in this matter. Further, his testimony was often vague and full of 'potential' scenarios, stating things such as it was hard to differentiate "hemorrhages" or "Tardieu spots"[9] while looking at the photographs from the autopsy because they looked alike.

{¶99} Contrary to this, Dr. Scala-Barnett testified to a variety of specific individual injuries on Erin's body that were found in strangulation/asphyxiation deaths but would *not* be found in a seizure-related death. Dr. Scala-Barnett could even tell where the pressure had been placed on Erin's body based on the injuries and she had a good idea of how the strangulation took place—a strangulation that really would only require one good arm in a carotid sleeper maneuver. On the whole, the evidence supports the trial court's finding that Erin died by strangulation. At the very least we cannot find that the trial court clearly lost its way on this issue. *See State v. Bey*, 8th Dist. Cuyahoga No. 106745, 2019-Ohio-1884, ¶ 87 (factfinder's decision to believe one expert over another did not create a manifest miscarriage of justice).

---

[9] Dr. Spitz explained Tardieu spots, stating that they were a result of decomposition.

{¶100} As to Williams' claim that there was no evidence he was even present at Erin's residence, let alone that he killed her, there was the cell phone tower data and the DNA evidence via the sperm linking him to Erin's residence. It is true that the cell phone tower data merely showed that Williams was in range of a specific cell tower during the time Erin was found to have died, meaning he could have been anywhere within the tower's radius. But at various points throughout the day he was near different cell towers and well out of the radius of this specific tower. During the determined time of Erin's death, he was within the radius of the specific tower and within the area of Erin's residence.

{¶101} In addition to this, Williams was typically fairly active on his cell phone, yet he did not use his cell phone during the suspected time of death—the same suspected time that he was in the general vicinity of 200 Karen Street. This then leads into the fact that Erin had Williams' semen in her vagina, some of which contained sperm tails. Testimony indicated that while some seminal *fluid* could stay in a vagina for days, *sperm tails* were some of the first things to break off and usually did not last longer than 8-12 hours in a live woman. Nevertheless, if they were deposited close to the time of death, testimony indicated that they would not degrade until the body started to degrade. Thus here a fair inference could be made that since the body was reasonably well preserved in the cold running shower water, not all of the sperm tails had degraded yet because they were deposited close to the time

of death. Under any testimony presented it would be illogical for the sperm tails to still be present if Williams had not had sex with Erin since July 2, 2017.

{¶102} The phone data and the sperm tails *do* link Williams to the residence on the night of Erin's death. Williams was also one of the few people who had a key to the residence and he stated that the door was locked when he went to 200 Karen Street with his father on July 6, 2017.

{¶103} Moreover, from nearly the moment Erin's body was found Williams began to proclaim that she had died of a seizure. He seemed certain of this before any autopsy or really any investigation whatsoever had taken place, which a finder-of-fact could certainly find unusual. This is especially true considering that Williams was contacting a woman the day after Erin's body was found saying that she died from a seizure, and very shortly thereafter he met a woman from Plenty of Fish that he had exchanged lewd photographs with. The woman found Williams suspicious and stated that he did not seem to care about Erin's death.

{¶104} Williams also angrily called the police multiple times during the investigation, spontaneously offering alibi witnesses and claiming that he had no part in Erin's death. He was adamant that she died of a seizure, even going so far as to make a claim that he spoke with the Lucas County Coroner and stating that the coroner told him no foul play was involved, despite the fact that this was completely contrary to the coroner's actual findings. Additionally, Williams claimed that he

went to 200 Karen Street on July 6, 2017, to get his checkbook, yet he presented a check to the Village of Waynesfield the day prior, potentially calling into question his reasoning for returning to the residence.

{¶105} Finally, Williams made his claim for the life insurance proceeds from Erin's death on July 26, 2017—a policy he had only acquired on June 1, 2017. Although it is true that was the first day he could apply for benefits, he made the specious claim that he wanted the policy to cover Erin's funeral expenses in case she died so that Erin's father would not have to bear the burden of the cost. At trial it was revealed that Williams had a significant amount of debt to a number of entities.

{¶106} Given Williams' actions and all of the evidence presented, we cannot find that the trial court clearly lost its way or created a manifest miscarriage of justice in finding him guilty of murder as charged in this matter. *See State v. Lott*, 51 Ohio St.3d 160 (1990) (holding that murder may be established solely by circumstantial evidence). Therefore, Williams' second assignment of error is overruled.

*Third Assignment of Error*

{¶107} In his third assignment of error, Williams argues that he received ineffective assistance of trial counsel. Specifically, Williams contends that his trial counsel was ineffective because trial counsel could not hear "significant" portions

of the testimony. In addition, Williams claims that his trial counsel failed to object at certain pivotal points in the trial, and that trial counsel failed to properly investigate the matter. Finally, Williams claims that trial counsel's cumulative errors prejudiced him.

### Standard of Review

{¶108} "To establish a claim for ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that counsel's deficient performance prejudiced him." *State v. Hernandez*, 3d Dist. Defiance Nos. 4–16–27, 28, 2017–Ohio–2797, ¶ 12, citing *State v. Phillips*, 3d Dist. Allen No. 1–15–43, 2016–Ohio–3105, ¶ 11, citing *State v. Jackson,* 107 Ohio St.3d 53, 2005–Ohio–5981, ¶ 133, citing *Strickland v. Washington,* 466 U.S. 668, 687 (1984). The failure to make either showing defeats a claim of ineffective assistance of counsel. *State v. Bradley*, 42 Ohio St.3d 136, 143 (1989), quoting *Strickland* at 697. ("[T]here is no reason for a court deciding an ineffective assistance of counsel claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.").

### Analysis

{¶109} Williams first contends that his trial counsel could not hear significant portions of the trial testimony, causing trial counsel to be ineffective. As

foundational support for his argument, Williams cites the following conversation

between the trial court and the attorneys at the beginning of the second day of trial.

> **[Defense Counsel]: Judge, just for the record, I want to indicate that when [the prosecutor] is questioning witnesses, and I even have my hearing aids in and cranked all the way up, there are times when I cannot hear the question. So I know that,- and I explained to [the prosecutor] that I asked you what the possible solution would be, so if I can't hear him, I guess I'll just raise my hand, and if that doesn't work maybe we can readjust the dynamics of the courtroom.**
>
> **THE COURT: So keep your voice up to accommodate [defense counsel] and myself.**
>
> **[Prosecutor]: Yes, Sir.**
>
> **THE COURT: I don't have the keenest hearing either. Any other matters?**
>
> **[Defense Counsel]: No sir.**

(Tr. at 152).

{¶110} Williams then cites to several other instances after this point in the

trial wherein defense counsel asked witnesses to repeat what had been said, asked

someone to speak up, or asked for a question to be repeated. (Tr. at 338, 604, 633,

652).[10] Williams claims that these handful of instances wherein defense counsel

---

[10] As an example of what he claims was ineffective, Williams points to defense counsel's cross-examination of Dr. Scala-Barnett wherein defense counsel stated,

> **I wonder,- let me show you the pictures. You tell me so we can see what it is. Maybe you told the Prosecutor, but I didn't hear that part so. Find on those exhibits which picture of the eye, something that we could relate to as a bulbar hemorrhage. And are you looking at what exhibit, [Dr. Scala-Barnett]?**

needed things repeated over a five-day trial establish that his counsel was ineffective. However, the record demonstrates the contrary—that when defense counsel was unable to hear some testimony or a question he asked that they be repeated.

{¶111} The fact that defense counsel brought up his difficulty hearing after the first day of trial and did not make it a major issue again would suggest that with the exception of the handful of times defense counsel needed something repeated, he could actually hear the questions and the testimony. The court and counsel even provided a signal that defense counsel could use if he could not hear. We decline to speculate that defense counsel was unable to hear further portions of testimony that are not listed *and* that this somehow prejudiced Williams.[11] We see no ineffective assistance here.

{¶112} Williams also claims that we should presume prejudice in this instance because his counsel's purported inability to hear significant testimony effectively rendered him without counsel during the trial. This argument is entirely specious and is contrary to the record wherein trial counsel thoroughly cross-examined witnesses and presented a case that got Williams acquitted of the most

(Tr. at 673).

[11] Williams cites to a portion of closing argument as support that his trial counsel misunderstood "favorable" testimony to him. However, as a trial court is well aware, closing arguments are not evidence and trial counsel was simply making an argument that the State's timeline was confusing and not conclusive because of differing evidence related to how long sperm tails could last.

serious count against him, and of an additional felony. Thus this argument is not well-taken.

{¶113} Next, Williams contends that in addition to his trial counsel having difficulty hearing portions of the testimony, the trial court also had difficulty hearing some of the testimony and defense counsel did nothing to ensure the factfinder could hear the evidence being presented. In support, Williams cites to numerous instances in the record wherein the trial court asked witnesses or attorneys to keep their voices up or to repeat answers. (Tr. at 175, 213, 321, 373). Again, the fact that the trial court asked for things to be repeated when questions or answers could not be heard would actually suggest that the trial court could hear the remainder of the questions and answers. There is no indication in the record to the contrary and we decline to speculate otherwise. This argument is also not well-taken.

{¶114} Williams next contends that his trial counsel's performance was deficient for failure to object at certain points in the trial. Specifically, he argues that when Scott Bowsher was testifying (the owner of 200 Karen Street who initially found Erin in the shower), Scott could not recall whether he turned on the bathroom light when he went inside the bathroom. Scott was interviewed by law enforcement after the incident and stated that his memory would probably be refreshed if he listened to the recording or read a report. Nevertheless, his memory was not refreshed as to whether he turned the bathroom light on.

{¶115} Williams now argues that his trial counsel was ineffective for failing to object to the State's improper attempts at refreshing Scott's recollection. However, failure to object is generally a tactical decision. *See State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, ¶ 83, citing *State v. Bradley*, 42 Ohio St.3d 136, 144 (1989). Moreover, as Scott plainly indicated he could not remember at trial whether he turned on the light when he entered the bathroom, there could be no resulting prejudice here as the trial court was left with that testimony.

{¶116} Nevertheless, Williams contends that trial counsel's failure to object regarding the bathroom light issue was compounded during closing argument when the State incorrectly claimed that Scott testified that when he went into the bathroom he turned on the light. Williams argues that defense counsel should have objected to this statement in closing arguments, and that his failure resulted in prejudicial error.

{¶117} Notably, the testimony regarding whether the bathroom light was on was largely in relation to Williams purportedly staging the murder scene or moving Erin's body into the shower and Williams was *acquitted* of this charge. Thus we fail to see how any prejudice could result here. Regardless of this point, closing arguments are not evidence and the trial court is readily aware of this. *See State v. Curry*, 3d Dist. Allen No. 1-15-05, 2016-Ohio-861, ¶ 85, citing *State v. Post*, 32 Ohio St.3d 380, 384 (1987) (stating that in a bench trial we presume the trial court

considered only relevant material and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary). We can find no ineffective assistance here as there is no prejudice.

{¶118} Williams next argues that trial counsel failed to object to Dr. Scala-Barnett's testimony that she believed Williams would be physically able to do a carotid chokehold *assuming he had a normal left arm and a less functioning right arm*. Contrary to his argument that this testimony should have been inadmissible, Dr. Scala-Barnett was qualified as an expert and answered the question in the nature of a hypothetical, specifically assuming that Williams had a normal functioning left arm. Thus we can find no error here as there was not a reasonable probability that the objection would have been sustained. *See State v. Jones*, 10th Dist. Franklin Nos. 18-AP33, 34, 2019-Ohio-2134, ¶ 52 (stating if an objection would not have been successful an appellant cannot prevail on an ineffective assistance claim); *see also State v. Minor*, 47 Ohio App.3d 22, 26-27, 546 N.E.2d 1343 (10th Dist.1988) (discussing use of hypothetical questions to an expert).

{¶119} Williams next contends that trial counsel's failure to investigate and test the State's theory prejudiced the defense. Specifically he argues that defense counsel failed to test DNA swabs taken from critical locations such as the shower door handle, the edge of the bathroom shower door, shower water handle, the faucet, and the bathroom sink. He claims that the testing could only benefit the defense

since Williams' DNA would be expected to be present on various surfaces and the presence of any other DNA would point to other suspects.

{¶120} Williams' argument on appeal ignores the fact that his defense was based on the claim that Erin died of a seizure and he had expert testimony to support this theory. If he started suggesting that Erin had died from something less than natural causes, it could have benefited the State as much as it could have helped him. Therefore it could be a reasonable strategy not to test these items. *State v. Mohamed*, 151 Ohio St.3d 320, 2017-Ohio-7468, ¶ 18 ("Questionable trial strategies and tactics, however, do not rise to the level of ineffective assistance of counsel.") In fact, having Williams' DNA present in the bathroom, though it may be expected to be there since he lived there previously, would not have been directly beneficial to his case. There is no indication that any other DNA was actually on these surfaces. Thus this argument is also not well-taken.

{¶121} Finally, Williams contends that the cumulative errors caused by trial counsel rendered his performance deficient. We have not found any prejudicial errors here to reach a cumulative error analysis, thus it is inapplicable to this situation. *State v. Mitchell*, 3d Dist. Union No. 14-19-14, 2019-Ohio-5168, ¶ 55, citing *State v. Carpenter*, 3d Dist. Seneca No. 13-18-16, 2019-Ohio-58, ¶ 104, citing *State v. Bertuzzi*, 3d Dist. Marion No. 9-13-12, 2014-Ohio-5093, ¶ 110. For all of these reasons, Williams' third assignment of error is overruled.

*Conclusion*

{¶122} For the foregoing reasons Williams' assignments of error are overruled and the judgment of the Auglaize County Common Pleas Court is affirmed.

***Judgment Affirmed***

**PRESTON and ZIMMERMAN, J.J., concur.**

**/jlr**